**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**District Judge Christine M. Arguello**

Civil Action No. 17-cv-00044-CMA

TIMOTHY P. NICHOLLS,

     Applicant,

v.

MATTHEW HANSEN, Warden, and
ATTORNEY GENERAL OF THE STATE OF COLORADO,

     Respondents.

---

## ORDER DENYING APPLICATION FOR WRIT OF HABEAS CORPUS

---

**Christine M. Arguello, District Judge.**

     The matter before the Court is an Application for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254 filed *pro se* by Applicant on January 3, 2017. (ECF No. 1).

The Court has determined it can resolve the Application without a hearing. *See* 28

U.S.C. § 2254(e)(2); Fed. R. Governing Section 2254 Cases 8(a).  Therefore,

Applicant's "Request for Court Ordered Evidentiary Hearing" (ECF No. 36) will be

denied.

     On October 9, 2019, Applicant filed a Motion to Appoint Pro Bono Counsel. (ECF

No. 41).  "There is no constitutional right to counsel beyond the direct appeal of a

criminal conviction." *Coronado v. Ward*, 517 F.3d 1212, 1218 (10th Cir. 2008).

Decisions regarding appointment of counsel in habeas corpus proceedings generally

are "left to the court's discretion." *Swazo v. Wyo. Dep't of Corr. State Penitentiary*

1

*Warden*, 23 F.3d 332, 333 (10th Cir. 1994). "However, there is a right to counsel in a habeas case when the district court determines that an evidentiary hearing is required." *Id.* In particular, Rule 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[i]f an evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A." Furthermore, Rule 6(a) provides that, "[i]f necessary for effective discovery, the judge must appoint an attorney for a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A."

As the Court has determined an evidentiary hearing is not warranted in this action and no discovery has been requested or authorized, Applicant is not entitled to appointment of counsel and the Court exercises its discretion in considering the motion. The Court is not persuaded that appointment of counsel is necessary in the interests of justice. The factors to consider in deciding whether to appoint counsel generally include the merits of the claims, the nature of the factual issues raised, the litigant's ability to present his claims, and the complexity of the legal issues being raised. *See Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir. 1995). "The burden is upon the applicant to convince the court that there is sufficient merit to his claim to warrant the appointment of counsel." *McCarthy v. Weinberg*, 753 F.2d 836, 838 (10th Cir. 1985). Although the state court record is extensive, it does not appear that the remaining habeas claims are particularly complex or that Applicant lacks the ability to argue the merits of those claims. Therefore, the Motion to Appoint Pro Bono Counsel (ECF No. 41) will be denied.

# I. BACKGROUND

Mr. Nicholls is currently incarcerated at the Sterling Correctional Facility in Sterling, Colorado. He is challenging his conviction in El Paso County District Court case number 05CR3776. He has paid the filing fee. (ECF No. 7).

In 2007, Mr. Nicholls was convicted by a jury of multiple offenses, including three counts of first degree murder and various other counts, including arson. (ECF No. 13-1 at 5-6). He was sentenced to three life terms without the possibility of parole and various other sentences. (*Id.* & ECF No. 13-6 at 5).

The Colorado Court of Appeals summarized the relevant factual background of Applicant's criminal case as follows:

> The trial evidence (the sufficiency of which is not challenged on appeal) showed defendant burned down his house – murdering his three young children in the process – to collect insurance. The prosecution's theory was that defendant committed those crimes together with his wife, who was tried separately and also convicted.
>
> Defendant and his wife were experiencing serious financial and marital problems, and using serious drugs, prior to the fire. The prosecution's proof included (1) physical evidence and expert testimony that the fire had been set intentionally, (2) testimony by a jailhouse witness that defendant admitted key details (consistent with the physical evidence) of how the fire was set, and (3) evidence of defendant's own varied explanations for the fire that were internally contradictory and at odds with the physical evidence.
>
> The fire occurred around 2:00 a.m. while defendant was home with his three sleeping children and his wife was out at a bar. Neighbors saw the fire and firefighters responded a short while later. Defendant, who escaped after having suffered painful but non-life-threatening burns, did not mention to a neighbor and a firefighter that his children remained inside the burning home.

Firefighters entering the home found the living room engulfed in flames. They found the couple's three-year-old daughter dead in the master bedroom and the eleven-year-old son dead in an upstairs hallway. They carried the couple's five-year-old daughter outside the home but she died within twenty-four hours.

Defendant's wife, intoxicated, arrived after the fire was extinguished. She claimed to have left burning candles inside the house that defendant must have forgotten to put out. She showed little concern for the children and did not attend their funeral.

Investigators later found cans of "Goof Off" – a highly flammable solvent – in the house and shrubs. The reactions of a trained fire detection dog revealed the presence of petroleum products throughout the living room. Forensic experts testified that the fire intentionally had been set at several places in that room.

Defendant and his wife submitted insurance claims for loss of their house and personal property. Defendant, as well as his wife, specifically inquired regarding "child-riders" to defendant's life insurance policy that would have covered the accidental death of a child. Defendant's wife was particularly incensed upon learning that the policy did not include such coverage.

A jailhouse witness testified that defendant admitted having acted with his wife to burn the house, kill the children, and collect the insurance proceeds. The witness recounted defendant's [sic] describing how his wife had sprayed the couch with Goof Off, how defendant then had his pajama-clad children sit on the couch, and how defendant later went downstairs and lit the living room on fire.

The prosecution presented evidence of defendant's varied explanations regarding his actions and the fire, and defendant also testified at trial. Defendant admitted having spoken to the jailhouse witness but claimed that he was "just kind of throwing scenarios out there" and that the witness had come up with the idea of accelerant having been sprayed all over the house. Defendant

> maintained that the fire was the accidental result of his not having extinguished candles left burning earlier that night.
>
> Physical and forensic evidence – which defendant's appellate brief describes as having "formed the heart of the prosecution's case" – corroborated the jailhouse witness's description of defendant's incriminating admissions and refuted defendant's other innocent explanations for the fire. Chemical analysis performed on the children's pajamas, defendant's jeans, and debris from the fire confirmed the presence of an accelerant. Investigators also discovered that the batteries had been removed from the smoke detectors. Forensic examination revealed no evidence supporting the claims of defendant and his wife that the fire resulted from burning candles. Nor did the forensic examinations reveal an electrical short circuit or any other accidental source of the fire.

*People v. Nicholls*, No. 07CA1248 (Colo. App. Jan. 14, 2010) (unpublished), (ECF No. 13-17 at 3-6) ("*Nicholls I*").

The trial judge described the lengthy proceedings:

> The trial lasted seventeen days. Prior to the trial, the defense filed 43 pleadings and 15 pretrial hearings were held, to include hearings held after the commencement of trial outside the presence of the jury. The jury, during the trial, asked 147 questions of the witnesses. The jury deliberated for 5 days posing numerous questions to the court.

(ECF No. 13-6 at 4-5).

The Colorado Court of Appeals affirmed Applicant's conviction on direct appeal.

(ECF No. 13-17). The Colorado Supreme Court denied his petition for writ of certiorari.

(ECF No. 13-15). On January 24, 2011, the United States Supreme Court also denied

Applicant's petition for writ of certiorari. (ECF No. 13-13).

On January 25, 2011, Mr. Nicholls filed a motion for reconsideration of his sentence with the trial court (ECF No. 13-1 at 43), which was denied on March 1, 2011 (*Id.* at 41).  He did not appeal. (*Id.*).

Then, on October 20, 2011, Mr. Nicholls filed a motion seeking return of personal property (ECF No. 13-1 at 40), which was denied on November 2, 2011 (ECF No. 13-12).  Applicant appealed and the Colorado Court of Appeals affirmed. *People v. Nicholls*, No. 11CA2581 (Colo. App. Jan. 31, 2013) (unpublished), (ECF No. 13-10) ("*Nicholls II*").

On November 17, 2011, Mr. Nicholls filed a *pro se* postconviction motion and supporting brief under Colo. Crim. P. 35(c) (ECF Nos. 13-8 and 13-9), which was later supplemented by appointed postconviction counsel (ECF No. 13-7).  Following a three-day evidentiary hearing, the trial court denied the postconviction motion in a nineteen page written order. (ECF No. 13-6).  The Colorado Court of Appeals affirmed the trial court's denial of the postconviction motion. *People v. Nicholls*, No. 14CA0972 (Colo. App. Dec. 24, 2015) (unpublished), (ECF No. 13-4) ("*Nicholls III*").  On August 1, 2016, the Colorado Supreme Court denied Applicant's petition for writ of certiorari. (ECF No. 13-2).

On August 8, 2016, Mr. Nicholls filed *pro se* a second postconviction motion under Colo. Crim. P. 35(c). (ECF No. 18-18).  That motion was denied on October 11, 2016. (ECF No. 18-19).  On September 20, 2018, the Colorado Court of Appeals affirmed the trial court's denial of the second 35(c) postconviction motion. *People v. Nicholls*, No. 16CA1997 (Colo. App. Sept. 20, 2018) (unpublished), (ECF No. 23-1) ("*Nicholls IV*").

Mr. Nicholls filed his § 2254 Application in this Court on January 3, 2017. (ECF No. 1). He asserted the following six claims:

(1)     The State Courts Denied My Ineffective Assistance of Counsel Claim By Relying On An Unreasonable Determination of Facts [the ineffective assistance of counsel ("IAC") claim is based on trial counsel failing to ask for a pretrial hearing pursuant to *Shreck/Daubert*[1]];

(2)     The State Courts Denied My Newly Discovered Evidence Claim By Relying On an Unreasonable Determination of the Facts;

(3)     The State Courts Misapplied Federal Law When They Denied My Newly Discovered Evidence Claim;

(4)     The State Courts Did Not Apply the Correct Federal Law In Resolving My Judge Shopping Claim;

(5)     The State Courts Did Not Apply the Correct Federal Law in Resolving My Claim That the [Trial] Court wrongfully allowed the grand jury indictment to be amended by a motion; and

(6)     The Claim of Actual Innocence.

(*Id.*).

On April 12, 2017, the Court ordered Respondents to file a pre-answer response addressing the affirmative defenses of timeliness under 28 U.S.C. § 2244(d) and/or exhaustion of state court remedies under 28 U.S.C. § 2254(b)(1)(A) and/or procedural default. (ECF No. 9). On April 28, 2017, Respondents filed a Pre-Answer Response, conceding that the application was timely. (ECF No. 13 at 5-9). However, Respondents argued that all of Mr. Nicholls' claims were procedurally defaulted, with the exception of his judge shopping claim, which was exhausted. (*Id.* at 18-45)

---

[1] *Shreck* is a Colorado case interpreting the admission of expert testimony under Colo. R. Evid. 702. *Colorado v. Shreck*, 22 P.3d 68 (Colo. 2001). It uses similar factors to the federal standard established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

On May 19, 2017, Applicant filed a Reply (ECF No. 14), arguing that the Respondents had mischaracterized several of his claims. He explained that he did not seek the Court to grant independent relief for his sixth claim based on actual innocence. (*Id.* at 8). Instead, his claim of actual innocence was apparently an attempt to persuade the Court to review his other constitutional claims even if they were defaulted. (*Id.* at 8-12). Further, Applicant asserted that he still had a claim pending in the Colorado Court of Appeals. (*Id.* at 6). It appeared – but was not entirely clear – that the claim still pending in state court was an ineffective assistance of postconviction appellate counsel claim. According to Mr. Nicholls, his postconviction appellate counsel failed to appeal all of his postconviction claims. Mr. Nicholls asked the Court to stay the instant habeas action so that his claims could be exhausted in state court. (*Id.* at 14).

On May 25, 2017, the Court directed Respondents to file a supplement to their Pre-Answer Response addressing the issue of whether a stay of this action was appropriate. (ECF No. 15). After receiving an extension of time, Respondents filed their Supplemental Pre-Answer Response on June 29, 2017. (ECF No. 18). Applicant filed a Reply to the Supplemental Pre-Answer Response on July 13, 2017. (ECF No. 19).

On September 7, 2017, the Court ordered the case stayed pending the Colorado Court of Appeals' determination of Applicant's appeal of the denial of his second state postconviction motion in Case No. 2016CA1997. (ECF No. 21). The parties were ordered to notify the Court in writing within five (5) days of the Colorado Court of Appeals' decision in Case No. 2016CA1997.

On October 1, 2018, Applicant notified the Court that the Colorado Court of Appeals had affirmed the denial of his second state postconviction motion in Case No.

2016CA1997. (ECF No. 23). Applicant also attached the Colorado Court of Appeals decision. (ECF No. 23-1). On November 14, 2018, the Court issued a Minute Order directing Applicant to inform the Court if he had filed, or intended to file, a petition for writ of certiorari with the Colorado Supreme Court regarding Case No. 2016CA1997. (ECF No. 24). On December 12, 2018, Applicant filed a Response, informing the Court that he had not filed, and did not intend to file, a petition for writ of certiorari with the Colorado Supreme Court and he wanted to proceed with the matter before this court. (ECF No. 25). As a result, the stay of the case was lifted. (ECF No. 26).

The Court reviewed the Pre-Answer Response, the Reply, the Supplemental Pre-Answer Response, and the Reply to the Supplemental Pre-Answer Response and filed an Order to Dismiss in Part and for an Answer on February 26, 2019. (ECF No. 34). In the February 26, 2019 Order, the Court dismissed claims two and three as not cognizable on federal habeas corpus review. The Court also determined that claim one was procedurally defaulted. However, the default of claim one may be excused if Mr. Nicholls can establish that a constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense. Finally, the Court determined that claims four and five were exhausted. Therefore, Respondents were directed to file an answer in compliance with Rule 5 of the Rules Governing Section 2254 Cases that fully addressed the merits of claims one, four, and five. (*Id.*).

Respondents filed an Answer on March 28, 2019. (ECF No. 39). Applicant filed a Traverse on May 1, 2019. (ECF No. 40). The State Court Record was filed on March 4, 2019. (ECF No. 35). After reviewing the State Court Record, the Court determined that it was incomplete. Therefore, on November 12, 2019, the Court issued an Order for the

9

Complete State Record. (ECF No. 42). The Court specifically indicated that certain files were damaged or empty on the CD of the state court record originally filed with the Court. (*Id.*). Additionally, the Court noted that specific relevant exhibits were not provided to the Court. (*Id.*). On December 9, 2019, a Supplemental State Court Record was filed. (ECF No. 46). On February 20, 2020, Applicant filed a Motion for Leave to Add Attachment to Petition (ECF No. 47), which was granted by the Court (ECF No. 48). The attachment indicates that, subsequent to Mr. Nicholls' trial, his defense counsel, Mr. Hartley, was sanctioned several times by the Attorney Regulation Committee for ethical violations. (ECF No. 49). Mr. Hartley was ultimately disbarred in July 2019. (*Id.*).

After reviewing the Application, the Answer, the Traverse, the State Court Record, the Supplemental State Court Record, and the attachments, the Court concludes, for the following reasons, that the Application should be denied and the case dismissed with prejudice.

## II. HABEAS CLAIMS

The remaining claims for review on the merits, Claims Four and Five, are as follows:

> (4) The State Courts Did Not Apply the Correct Federal Law In Resolving My Judge Shopping Claim; and

> (5) The State Courts Did Not Apply the Correct Federal Law in Resolving My Claim That the [Trial] Court wrongfully allowed the grand jury indictment to be amended by a motion.

10

Additionally, Claim One, which was procedurally defaulted but is subject to review if Mr. Nicholls can establish that a constitutional violation has probably resulted in the conviction of one who is actually innocent of the substantive offense, is:

> (1) The State Courts Denied My Ineffective Assistance of Counsel Claim By Relying On An Unreasonable Determination of Facts [the ineffective assistance of counsel ("IAC") claim is based on trial counsel failing to ask for a pretrial hearing pursuant to *Shreck/Daubert*].

## III. LEGAL STANDARDS

Section 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court, unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir. 2003). The threshold question pursuant to § 2254(d)(1) is whether Applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). The "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." *Cullen v. Pinholster*, 563 U.S.170, 181 (2011). "Finality occurs when direct state appeals have been exhausted and a petition

for writ of certiorari from this Court has become time barred or has been disposed of."

*Greene v. Fisher*, 565 U. S. 34, 39 (2011) (citing *Griffith v. Kentucky*, 479 U.S. 314, 321

n.6 (1987)).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of

[the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Williams*, 529 U.S. at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases
> where the facts are at least closely-related or similar to the case *sub
> judice*.  Although the legal rule at issue need not have had its genesis in
> the closely-related or similar factual context, the Supreme Court must
> have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry

pursuant to § 2254(d)(1). *See id.* at 1018.  If a clearly established rule of federal law is

implicated, the Court must determine whether the state court's decision was contrary to

or an unreasonable application of that clearly established rule of federal law. *See*

*Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if:
> (a) "the state court applies a rule that contradicts the governing law set
> forth in Supreme Court cases"; or (b) "the state court confronts a set of
> facts that are materially indistinguishable from a decision of the Supreme
> Court and nevertheless arrives at a result different from [that] precedent."
> *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal
> quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at
> 405).  "The word 'contrary' is commonly understood to mean 'diametrically
> different,' 'opposite in character or nature,' or 'mutually opposed.'"
> *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly
> established federal law when it identifies the correct governing legal rule
> from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at
> 407-08.  Additionally, we have recognized that an unreasonable

12

application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply. *Carter* [*v. Ward*], 347 F3d. [860,] 864 [10th Cir. 2003] (quoting *Valdez* [*v. Ward*], 219 F.3d [1222] 1229-30 [10th Cir. 2000]).

*House,* 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective one. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. In addition,

evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). The Court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard

13

against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (internal quotation marks and citation omitted).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671. Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims of factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct, *see Sumner v. Mata*, 455 U.S. 591, 592-93 (1982), and Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin v. Zavaras*, 107 F.3d 1465, 1470 (10th Cir. 1997). "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A claim, however, may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*,

14

562 U.S. at 98 ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").  Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [its] independent review of the record and pertinent federal law persuades [it] that [the] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id.* at 1178. "This 'independent review' should be distinguished from a full de novo review of the [applicant's] claims." *Id.* (citation omitted).  Likewise, the Court applies the AEDPA (Antiterrorism and Effective Death Penalty Act) deferential standard of review when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard. *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005).  If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

# IV. ANALYSIS

## A. Claim Four

Mr. Nicholls alleges in Claim Four that his constitutional rights were violated because of judge shopping. The Colorado Court of Appeals addressed the merits of Applicant's judge shopping claim and rejected it as follows:

> Defendant contends that the district court allowed impermissible judge shopping when it granted the prosecution's motion to transfer defendant's Crim. P. 35(c) proceeding to the same judge who presided at trial. We disagree.
>
> . . .
>
> The cases cited by defendant indicate that impermissible "judge shopping" occurs when the prosecution attempts to have a case tried in the first instance by a particular judge. *See State v. Simpson*, 551 So. 2d 1303 (La. 1989). We need not decide the propriety of such a procedure, because it did not occur here.
>
> We are not persuaded by defendant's apparent contention that random assignment of cases is required to ensure due process. *See Sinito v. United States*, 750 F.2d 512, 515 (6th Cir. 1984) (a defendant does not have the right to have his or her judge selected by a random draw). If it were, then there could be no rationale for assigning cases to judges who hold particular subject matter expertise, such as water judges, juvenile court judges, or probate judges. We also note that, even where cases are randomly assigned, they still may wind up being assigned to the same judge who previously heard another aspect of the case. As the Louisiana Supreme Court held in *Simpson*, 551 So. 2d at 1304, a "procedure adopted by the court which does not vest the district attorney with power to choose the judge to whom a particular case is assigned" is permissible.
>
> As long as no grounds exist that would require disqualification under section 16-6-201, C.R.S. 2015, there is no prohibition against assigning a case to a particular judge. This is true even where the judge may have formed an

> unfavorable impression of a party to the case in the normal
> course of hearing evidence and making observations of a
> party. *See Smith v. Dist. Court*, 629 P.2d 1055, 1057 (Colo.
> 1981). Given the lack of a motion to disqualify Judge Miller
> from hearing the postconviction motion, it is safe to conclude
> that no such grounds existed. *See Withrow v. Larkin*, 421
> U.S. 35, 47 (1975) (stating there is "a presumption of
> honesty and integrity in those serving as adjudicators").
>
> Our supreme court has said that, under the version of Crim.
> P. 35(b) in effect in 1976 (which encompassed similar relief
> to that available in current Crim. P. 35(c)), that rule
> "contemplate[s that] . . . wherever possible," the judge who
> rules upon the motion for postconviction relief should be the
> same judge who presided over the defendant's trial. *People
> v. Trujillo*, 190 Colo. 497, 500, 549 P.2d 1312, 1314 (1976).
> Given this binding precedent, we perceive no error in
> transferring the case back to Judge Miller for his ruling on
> the motion.

(ECF No. 13-4 at 3-8) (*Nicholls III*).

Initially, Respondents argue that Claim Four should be rejected because it fails to

state a cognizable habeas claim. This argument is persuasive.

Claim Four is based on an alleged error in transferring Mr. Nicholls'

postconviction proceeding to a particular judge. However, there is no federal

constitutional right to postconviction review in state court. *See Pennsylvania v. Finley*,

481 U.S. 551, 557 (1987). Therefore, a claim of constitutional error that "focuses only

on the State's post-conviction remedy and not the judgment which provides the basis for

[the applicant's] incarceration ... states no cognizable federal habeas claim." *Sellers v.

Ward,* 135 F.3d 1333, 1339 (10th Cir.1998); *see also Steele v. Young,* 11 F.3d 1518,

1524 (10th Cir. 1993) (noting that petitioner's challenge to state "post-conviction

procedures on their face and as applied to him would fail to state a federal constitutional

claim cognizable in a federal habeas proceeding"). As a result, Claim Four will be denied for failure to state a cognizable federal habeas claim.

## B. Claim Five

In Claim Five, Mr. Nicholls argues that his constitutional rights were violated when the state court allowed the prosecution to amend the grand jury indictment by motion and add a conspiracy charge. (ECF No. 1 at 26). Later, in his Traverse, Mr. Nicholls apparently acknowledges that the additional charge of conspiracy was actually brought by an information. (ECF No. 40 at 23-24). Although he argues that because the conspiracy charge was brought in the same criminal proceeding as the original charges, it should be considered an amendment to the indictment. (*Id.*). Mr. Nicholls was acquitted of the conspiracy charge. However, he contends he was prejudiced by the addition of the charge because the jury was allowed to hear various hearsay statements of his wife, the alleged co-conspirator, that would have otherwise been inadmissible. (ECF No. 1 at 27). He further alleges that his due process rights were violated by the addition of the conspiracy charge by information because he did not receive the procedural safeguards required. (*Id.* at 28). The Colorado Court of Appeals rejected this claim as follows:

> Defendant next contends that the trial court improperly allowed the prosecution to introduce evidence of his wife's conduct and statements that the trial court found were relevant to her state of mind in allegedly joining with defendant to burn their house and kill their children. The abuse of discretion standard governs our review of trial court evidentiary rulings made over a timely defense objection. *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002).
>
> Defendant's evidentiary challenges rest on his premises that (1) the prosecution improperly added a separate conspiracy

charge to the other crimes charged in the indictment and (2) the evidence pertaining to his wife could not otherwise have been admitted. We do not agree with either premise and, therefore, hold that the trial court did not abuse its discretion by admitting the evidence.

1. The Conspiracy Charge

Defendant never objected to the conspiracy charge (which was added by information) being tried together with the other crimes previously charged by indictment. Appellate review of this challenge would normally be limited by the plain error standard, *see* Crim. P. 52(b), and faces the further impediment of mootness because the conspiracy charge was dismissed after the jury deadlocked on it. Defendant nonetheless contends we should review the issue de novo because it involves a jurisdictional defect that may be raised at any time under Crim. P. 12(b) and that has continuing significance as to the evidentiary rulings.

There is no merit to defendant's contention that allowing him to be tried on charges filed by indictment and on a separate charge filed by information constituted an improper amendment of the indictment. Colorado law allows defendants to be charged by complaint, information, or indictment, *see* § 16-5-101(1)(a)-(c), C.R.S. 2009, and leaves to prosecutorial discretion the selection of which charging instrument to use. *People v. Rodriguez*, 914 P.2d 230, 256-57 (Colo. 1996).

Here, the prosecution did not alter the grand jury indictment to include the conspiracy charge: the counts of the indictment remained untouched and the information simply added an additional count of conspiracy. There thus was no "amendment" to the indictment. *Cf. Tracy v. State*, 573 A.2d 38, 40 (Md. 1990) ("Bringing new charges by new charging documents are not amendments."). Defendant misplaces reliance on federal cases involving improper amendments to indictments because federal prosecutors may not add felony charges other than through indictment. *See* U.S. Const. amend. V. This constitutional limitation, however, does not apply to states. *See Hurtado v. California*, 110 U.S. 516 (1884).

Defendant has failed to show any jurisdictional defect or any amendment to the indictment. At most, his challenge goes to the prosecution's right to have the properly filed indictment charges tried with the conspiracy charge. That is a joinder issue – and one about which defendant cannot properly now complain given his lack of any trial court objection under Crim. P. 8(a) or 14. *See People v. Peterson*, 656 P.2d 1301, 1304 (Colo. 1983).

2. The Evidentiary Rulings

Defendant thus has failed to establish the premise – that adding the conspiracy charge filed by information amended the indictment – upon which he bases his evidentiary challenges. We hold, moreover, that the evidence would have been admissible in any event. And, to the extent defendant raises independent evidentiary challenges, we reject them.

The trial court issued a thorough pretrial order articulating its reasons for allowing the evidence. It found that the evidence – including evidence of the wife's (and defendant's) drug use, evidence of the wife's (and defendant's) financial problems, and evidence of the wife's actions and statements indicating disregard for the children's lives before and after the fire – was relevant and had probative value that was not outweighed by the danger of unfair prejudice. (The order did, however, exclude certain evidence, such as generalized evidence of "bad parenting.")

The evidence was relevant and had probative value not just to the conspiracy count but also to help the jury understand what otherwise would seem to be an incomprehensible act allegedly committed by both parents. As the trial court correctly explained, the evidence was relevant to explain "how two parents might reach a mental state whereby the killing of the children seemed to them to be a reasonable solution to their problems." There was no abuse of discretion.

Defendant's additional arguments, some raised for the first time on appeal, do not compel a different result. The conduct and statements of defendant's wife were not inadmissible hearsay, because they were not offered for their truth, CRE 801(c), and in any event were admissible to

show the wife's state of mind, CRE 803(3).  Nor did their admission violate the Confrontation Clause: only those statements made to investigating officers were "testimonial," and even testimonial statements do not implicate the Confrontation Clause where offered for purposes other than their truth. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)); *People v. Isom*, 140 P.3d 100, 104 (Colo. App. 2005).

(ECF No. 13-17 at 10-14) (Nicholls *I*).

First, the Court finds that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Specifically, the state court's finding that there was not an "amendment" to the indictment but instead an *additional* charge was brought through an information is sufficiently supported by the evidence.  Mr. Nicholls, to some extent, concedes this factual issue. (*See* ECF No. 40 at 23-24 (noting that the conspiracy charge was brought by an information, but arguing that it actually constituted an amendment to the indictment because it was filed in the same case as the indictment)).

Therefore, Mr. Nicholls is entitled to habeas relief for Claim Five only if the decision of the Colorado Court of Appeals was contrary to or an unreasonable application of clearly established federal law under § 2254(d)(1).  Liberally construing Mr. Nicholls' claim, he apparently argues that: (1) he was not given the procedural due process safeguards required for a charge brought by an information; and (2) his constitutional rights were violated because the charges brought by indictment and by information were tried in the same trial.

In the Answer, Respondents argue that the Colorado Court of Appeals' decision was not contrary to nor an unreasonable application of Supreme Court case law. (ECF

No. 39 at 38).  According to Respondents, in *Hurtado v. California*, 110 U.S. 516 (1884),

the Supreme Court held that the federal Constitution's grand jury guarantee does not

apply to state prosecutions.  Respondents further argue that the Colorado Court of

Appeals did not unreasonably apply the clearly established federal law of *Hurtado* by

determining that there was no error when the court allowed the prosecution to add a

conspiracy charge by an information even when the other charges against Mr. Nicholls

were brought by an indictment.

In contrast, Mr. Nicholls argues that the Colorado Court of Appeals' decision was

an unreasonable application of the clearly established federal law of *Hurtado*.  Applicant

states:

> [In *Hurtado*,] the issue was defendant's eventual conviction
> by the filing of [an] information and not grand jury indictment.
> In my case, there was an indictment, amended by a motion
> to the court.  *Hurtado* stands for the proposition that while a
> state may not be *obligated* to use the mechanism of Grand
> Jury indictment, once it does all the procedural protections
> apply.  *Hurtado*, supra at 537-38.
>
> *Hurtado* made clear that due process of law still applies
> whatever method of prosecution is used by the State.  The
> *Hurtado* court explicitly stated that when the indictment
> process has been avoided by the State due process requires
> special procedural protections for the defendant, including
> the right to examine witnesses through a preliminary
> hearing. *Id.* at 538.  In my case the State wanted to have its
> cake and eat it too: it wanted to use the indictment process
> where it could avoid my ability to cross-examine witnesses
> and have other procedural protections, while also being able
> to charge things not approved by the Grand Jury.  This was
> fundamentally unfair and a violation of federal law, as
> espoused by *Hurtado*.

(ECF No. 1 at 28).  Mr. Nicholls misconstrues the clearly established law of *Hurtado*.

Specifically, the Supreme Court stated in *Hurtado*:

Tried by these principles, we are unable to say that the substitution for a presentment or indictment by a grand jury of the proceeding by information after examination and commitment by a magistrate, certifying to the probable guilt of the defendant, with the right on his part to the aid of counsel, and to the cross-examination of the witnesses produced for the prosecution, is not due process of law. It is, as we have seen, an ancient proceeding at common law, which might include every case of an offense of less grade than a felony, except misprision of treason; and in every circumstance of its administration, as authorized by the statute of California, it carefully considers and guards the substantial interest of the prisoner. It is merely a preliminary proceeding, and can result in no final judgment, except as the consequence of a regular judicial trial, conducted precisely as in cases of indictments. In reference to this mode of proceeding at the common law, and which he says 'is as ancient as the common law itself,' Blackstone adds, (4 Comm. 305:) 'And as to those offenses in which informations were allowed as well as indictments, so long as they were confined to this high and respectable jurisdiction, and were carried on in a legal and regular course in his majesty's court of king's bench, the subject had no reason to complain. The same notice was given, the same process was issued, the same pleas were allowed, the same trial by jury was had, the same judgment was given by the same judges, as if the prosecution had originally been by indictment.'

*Hurtado*, 110 U.S. at 538.

Although *Hurtado* mentioned the procedural safeguards that were present in the specific California case it was considering, it did not hold that those safeguards, such as preliminary hearings, were constitutionally required if criminal charges were brought by an information. *See Peterson v. California*, 604 F.3d 1166, 1171 (9th Cir. 2010) ("Although *Hurtado* did observe that California's then-existing preliminary hearing procedures included the right to cross-examination, *Hurtado* did not hold that such a right was essential in order to pass due process muster."). The *Hurtado* Court emphasized the fact that a mere preliminary proceeding could not result in a final

23

judgment. *Hurtado*, 110 U.S. at 538. Instead, final judgment would only occur after a trial. *Id.* In this case, Mr. Nicholls' pre-trial liberty was not at stake by bringing an additional count through an information because he was already incarcerated based on the previous charges brought by indictment. Further, in *Lem Woon v. Oregon*, 229 U.S. 586, 33 S. Ct. 783, 57 L.Ed. 1340 (1913), the Supreme Court considered whether a state procedure permitting direct filing of an information without "any examination of commitment by a magistrate … or any verification other than [the] prosecutor's official oath" violated the accused's due process rights. The Supreme Court unanimously held that the lack of a preliminary hearing caused no due process difficulties. *Id.* at 590.

As such, the Court concludes that the Colorado Court of Appeals did not unreasonably apply any clearly established federal law, including the clearly established federal law of *Hurtado.*

In his Traverse, Mr. Nicholls argues that the State violated the Colorado Constitution and Colorado statutes by bringing charges by both indictment and information. He states, "*Hurtado* clearly points out that states have the right to prosecute people as the statute dictates they can." (ECF No. 40 at 23). He then argues that the Colorado statute, C.R.S. § 16.5.205(2), allows for charges to be brought by an indictment "OR" an information, but there is no provision for the filing of multiple charges by multiple means in a single case. (*Id.*). He alleges that "this ploy by the state was to circumvent the hearsay rules and to introduce inflammatory evidence about applicant's wife, in order to finally claim that because marriage [sic] to her, and all her questionable behavior and supposed statements (many of which would not have been allowed without conspiracy charge) that applicant must also be guilty." (*Id.* at 24). He also

24

states that "[i]f[] the state had chosen to hold a separate trial pertaining to the alleged conspiracy, then applicant would have no argument." (*Id.*).

Applicant's arguments in his Traverse focus solely on violations of state law and the state constitution. As explained above, § 2254 provides relief only for violations of federal law, not violations of state law. *See* 28 U.S.C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, Mr. Nicholls' allegations of state law and state constitutional violations provide no basis for habeas relief.

Further, his argument that the evidence of his wife's conduct was allowed to be introduced at trial only because of the additional conspiracy charge was specifically rejected by the Colorado Court of Appeals. (ECF No. 13-17 at 14) ("The evidence [of the wife's statements and conduct] was relevant and had probative value not just to the conspiracy count but also to help the jury understand what otherwise would seem to be an incomprehensible act allegedly committed by both parents."). Mr. Nicholls fails to demonstrate that this evidentiary decision by the CCA was contrary to or an unreasonable application of clearly established federal law. Further, Mr. Nicholls does not cite any contradictory governing law set forth in Supreme Court cases or any materially indistinguishable Supreme Court decision that would compel a different result. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). Mr. Nicholls also fails to demonstrate that the state court's evidentiary determination was based on an unreasonable determination of the facts in light of the evidence presented under § 2254(d)(2).

Finally, his argument that the conspiracy charge should have been tried separately does not demonstrate he is entitled to habeas relief. He was acquitted of the

conspiracy charge. Therefore, he faced no prejudice from the charge being tried in a single trial along with the other charges. His argument regarding a separate trial apparently relates to his argument that evidence of his wife's conduct should not have been allowed. However, as discussed above, even if the conspiracy charge was tried in a separate trial, the evidence of his wife's conduct could have been introduced in both trials. Therefore, Mr. Nicholls has not demonstrated any constitutional violation.

In conclusion, Mr. Nicholls fails to demonstrate the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. As a result, Mr. Nicholls is not entitled to habeas relief on Claim Five.

## C. Claim One

In Claim One, Applicant asserts that the State courts erroneously denied his ineffective assistance of counsel ("IAC") claim by relying on an unreasonable determination of facts. Specifically, he alleges that he received IAC because his trial counsel failed to request a pretrial *Shreck/Daubert* hearing. According to Mr. Nicholls, a *Shreck/Daubert* hearing should have been requested to "address the scientific testimony and scientific evidence which was totally lacking proper methodology, but to which a large number of experts testified at trial." (ECF No. 1 at 5).

As discussed in the Order to Dismiss in Part, Mr. Nicholls' IAC claim is procedurally defaulted because he did not include the claim in his appellate brief to the Colorado Court of Appeals. (ECF No. 34 at 10). Additionally, in the Order to Dismiss in Part, the Court concluded that Applicant could not establish cause and prejudice to excuse the default of the claim. (*Id.* at 19-21).

However, even when a claim is procedurally defaulted and the Applicant cannot establish cause and prejudice to excuse the default, the federal habeas court may still address the merits of the claim if not doing so "will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A "fundamental miscarriage of justice," means that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). "[T]he fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The standard requires an applicant to "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Id.* at 324. The "*Schlup* standard is demanding." *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). As a result, fundamental miscarriages of justice are "extremely rare." *Schlup*, 513 U.S. at 324.

"Simply maintaining one's innocence, or even casting some doubt on witness credibility, does not necessarily satisfy this standard." *Frost v. Pryor*, 749 F.3d 1212, 1232 (10th Cir. 2014) (citing *Stafford v. Saffle,* 34 F.3d 1557, 1562 (10th Cir. 1994) (new evidence was "only impeachment evidence, rather than evidence of actual innocence" supporting a claim under *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)); *cf. Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (claim of actual innocence must be based on new evidence

suggesting "factual innocence, not mere legal insufficiency")).  In order to pass through the narrow *Schlup* gateway, a petitioner must "demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt--or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.  In making this inquiry, a court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," and "assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* (quotations omitted).

In this case, Mr. Nicholls argues that he is actually innocent and, liberally construing his argument, he contends that failure to reach the merits of his IAC claim would result in a fundamental miscarriage of justice.  Mr. Nicholls contends that there are two new pieces of reliable evidence: (1) the prosecution's fire expert, Dr. DeHaan, reversed his expert opinion regarding arson in a separate case in Louisiana because of new advances in fire science; and (2) "the significant scientific advancements in the field of fire investigation," including a new ASTM (formerly known as "American Society for Testing and Materials") standard regarding the reporting of accelerants (xylenes) in fire debris samples. (*See* ECF No. 1 at 18-21).

In their Pre-Answer Response, Respondents argued that Applicant's fundamental miscarriage of justice assertion must be denied because there was other substantial evidence of guilt presented at trial. (ECF No. 13 at 36-37).  Because the Respondents relied on "substantial evidence of guilt presented at trial" to rebut Applicant's fundamental miscarriage of justice argument, the Court stated in the Order

to Dismiss in Part that it would deferr ruling on the fundamental miscarriage of justice issue until after reviewing the state court record. (ECF No. 23 at 22 (citing *Han Tak Lee v. Glunt*, 667 F.3d 397, 407-08 (3d Cir. 2012) (noting that a habeas petitioner can, by showing that a prosecution's fire expert's testimony is now discredited by new developments in science that made the prosecution's evidence "fundamentally unreliable," establish a due process violation and obtain habeas relief)).

In the Answer, Respondents argue that the "new evidence" provided by Mr. Nicholls does not meet the high bar the Supreme Court has set for the actual-innocence exception because the state court made factual determinations that are controlling pursuant to § 2254(e)(1), and those determinations preclude a finding that this evidence is "new" and/or is of a quality that, having considered it in addition to the trial evidence, "no reasonable juror would have convicted." (*See* ECF No. 39 at 19 (citing *Schlup*, 513 U.S. at 327 (other citations omitted)). As indicated by Respondents, the state court did consider Applicant's "new evidence" in a three day evidentiary hearing regarding his 35(c) postconviction motion.

In a thorough opinion, the postconviction court rejected Applicant's request for a new trial based on the same new evidence as follows:

> The 35(c) hearing provided the court an opportunity to observe several of the key participants' testimony once again – including Mr. Nicholls, Mr. Lentini [Defendant's fire expert], Mr. DeHaan [Prosecution's fire expert], Fire Investigator Schmitt and forensic accountant, Mr. Johnson.
>
> Mr. Lentini testified at the hearing that "the crux" of Mr. DeHaan's trial testimony has subsequently been materially rebutted – by Mr. DeHaan himself in a subsequent arson trial held in the State of Louisiana. According to Lentini, the "crux" of Mr. DeHaan's testimony against Mr. Nicholls in

2007, was based upon now discredited "hand" mathematical calculations. DeHaan determined (as all experts, including Lentini) that the living room, where the fire started, somehow sustained sufficient megawatts of heat to take a room to what is known as a "flashover" when the room essentially spontaneously combusts. However, according to Mr. Lentini, DeHaan further determined from his "hand" mathematical calculations that the furniture alone was not sufficient, without the aid of some accelerant, to cause the room to receive sufficient megawatts to get to flashover. According to Lentini, DeHaan then utilized a disfavored "negative corpus" test to draw the conclusion of arson.

According to Lentini, in a later case held in Louisiana 1 ½ years after the Nicholls trial, Mr. DeHaan reached similar conclusions as in this case that a point of origin could be identified by use primarily of his hand mathematical calculations. However, in the Louisiana case, Mr. DeHaan later changed his opinion because he admitted that there had been new studies which called into question his hand modeling theory for determining the combustionable megawatts which could be attributed to certain pieces of furniture. Lentini opined that these new studies showed that DeHaan's calculations could potentially "over-predict" the amount of megawatts needed to go to flashpoint by as much as 60% -- thereby calling into question the conclusion that the fire was aided by an accelerant in multiple points of origin. According to Mr. Lentini, Mr. DeHaan's testimony in the two cases is "completely opposite" and that the opinion in the Louisiana case proves that the conclusions in the Nicholls case "are not valid" and the multiple points of origin theory supporting a finding of arson is completely undermined.

Dr. DeHaan also testified at the 35(c) hearing. The court finds him to be the more compelling witness in what has become a rather classic battle of two highly qualified experts. He is more published than Mr. Lentini and has provided more balanced expertise on the various sides of issues than Mr. Lentini. However, most important to the issue at hand, is that the "crux" of Mr. DeHaan's testimony at trial and as recounted at the hearing is really not the so-called "hand calculations." According to Mr. DeHaan, the questioned mathematical calculations have never been the "crux" of his opinion in Nicholls, but rather one of several means used to

test or challenge a hypothesis. This statement by DeHaan was directly supported by two other fire investigation experts who testified at the hearing – Kirk Schmitt and Cameron Novak. There were and are a number of factors DeHaan utilized in his opinion – including his personal visit and investigation of the scene, numerous witness statements (including highly inconsistent statements by Mr. Nicholls which are unquestionably refuted by evidence at the scene), scene videos, reconstruction of furniture location, arc mapping which follows the course of the fire in the home's electrical wiring system, knowledge of fire dynamics, and fire pattern study which is supported by his participation in approximately 500 controlled burns of various "fuel packages."

. . .

Of further significance is the fact that DeHaan's qualification of his opinion in the Louisiana trial appears to have had either nothing or very little to do with any new studies challenging the reliability of mathematical calculations. Rather, unlike the Nicholls fire, the scene was completely non-existent when he arrived. It had been burned thoroughly and had been dismantled. He was restricted to relying on 10-12 photos of the scene from before and after the fire as well as some eyewitness statements and a controlled burn of a similar structure after the fact. After he had completed his report, a court ruling was issued narrowly restricting the use of certain evidence, to include two key eyewitnesses who provided critical testimony of the location of the interior furniture. Without being able to use the "fuel load" provided by these witnesses, he had virtually no information upon which he could draw conclusions of the likely heat and origins of the fire. With that, he amended his report stating that in light of the court's suppression order he could not provide an opinion of fire causation and his mathematical calculations or any other assessment was of no value. So, while DeHaan's revised report in the Louisiana case did reference some additional studies criticizing over-use of "hand calculations", the material reason for changing his opinion had little or nothing to do with those studies.

Of further significance is that at the Nicholls trial, defense counsel extensively cross-examined Mr. DeHaan on the

then-existing studies reflecting a +/- 30% error rate when one uses "mathematical modeling" in estimating certain heat values. (See p. 4164 ℓ. 20; p. 4170 ℓ. 5). The record also reflects extensive cross-examination on the mathematical calculation for potential error by DeHaan.

…

Contrary to Lentini's criticism, DeHaan did not change his opinion in the Louisiana case based upon new studies which called into question his calculations, but rather, because he had no evidence he was allowed to consider upon which to base those calculations. Moreover, the 35(c) challenge by Lentini that DeHaan was the "only person" doing mathematical calculations was also raised in the trial in front of the jury, and DeHaan rebutted these, just as he did at the 35(c) as discussed previously in this order.

According to DeHaan, there is nothing that has been presented in the science of fire investigation – including any subsequent studies he refers to in Exhibit W – Appendix C which would in any way change his opinion of arson in the Nicholls case. His initial wide-ranging computation of 3-6 megawatts required to cause the flashover in the living room remains unchanged, as well as his use of mathematical hand calculations as just one element of numerous factors to be considered in testing a hypothesis of arson.

Therefore, the Louisiana opinion and the Nicholls opinion appear to be based on significantly different data available for scene analysis, and DeHaan's change of opinion in the Louisiana case is highly unlikely to result in any change of how a fact finder would look at this case.

The post-trial revised wording in ASTM 1618 in no way completely discredits the use of xylenes in determining location of accelerant in fire investigations, but similar to the mathematical modeling criticism, provides additional caution to the perils of over-reliance. The scientific community's debate and caution about xylenes was discussed at trial by Lentini and in fact, the proposed subsequent changes to ASTM 1618 were acknowledged by DeHaan at trial. Therefore, the evidence is not "new"; however, even if it is, it also fits within the category of impeachment evidence.

…

> Accordingly, the Court finds that the "new" evidence provided by DeHaan [sic] acknowledging additional studies reflecting limitations in the methodology is impeachment, and further, would probably not bring about an acquittal verdict if presented at another trial. Since it was already significantly addressed at trial, the entire area of the limitations of hand calculations was adequately explored at the Nicholls trial and those limitations were acknowledged to some degree by Mr. DeHaan, even at that time.

(ECF No. 13-6 at 6-11). The Colorado Court of Appeals affirmed. (ECF No. 13-4).

Respondents argue that § 2254(e)(1)'s deference applies to Mr. Nicholl's actual innocence claim because he made a similar claim based on the same new evidence before the state court. The state postconviction court found that: (1) the material reason for DeHaan's change of opinion in the Louisiana case was not based on new advancements in science, but rather because he was limited in the data he could use for fire analysis (*see* ECF No. 13-4 at 9-10); (2) any new studies acknowledging the limitations in methodologies used by DeHaan (and other fire experts) is impeachment evidence (*see id.* at 11); and (3) the new ASTM standard regarding xylenes was not "new" evidence and, even if it was, it was simply impeachment evidence (*see id.* at 10).

As discussed above, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Although the Tenth Circuit has not considered the issue, the Fourth and Fifth Circuits have ruled that § 2254(e)(1)'s deference applies in cases where the state court has made factual determinations relating to a petitioner's new evidence and actual innocence claim. The

Fourth Circuit explained: "Where a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under *Schlup*, [§] 2254(e)(1) requires that the state court's findings of fact not be casually set aside." *Sharpe v. Bell*, 593 F.3d 372, 378-79 (4th Cir. 2010); *see also Reed v. Stephens*, 739 F.3d 753, 768-69 (5th Cir. 2014) (affirming the district court's application of § 2254(e)(1)'s deference standard to the state court's findings of fact with regard to the petitioner's actual innocence claim).  In the instant case, the state trial court and the CCA adjudicated Mr. Nicholls' request for a new trial based on newly discovered evidence by applying the Colorado standard for new evidence claims that is nearly identical to the *Schlup* standard. (ECF No. 13-6 at 5 (citing *People v. Schneider*, 991 P.2d 296 (Colo. App. 1999) (stating that "[t]he determination of the probable effect of the new evidence should be premised on whether, when considered with all the other evidence, the newly discovered evidence is such that a reasonable jury would probably conclude that a reasonable doubt concerning defendant's guilt existed and thereby reach an acquittal verdict.")); *see also House*, 547 U.S. at 538 (explaining that the *Schlup* actual innocence standard requires the petitioner to "demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt.").  Given that the postconviction court held a three day evidentiary hearing and was able to assess the credibility of numerous witnesses, there is a persuasive argument that the state court's factual determinations should be given considerable deference.  However, the Court need not resolve whether the AEDPA deference applies because Mr. Nicholls's actual innocence claim fails regardless of whether the Court considers it *de novo* or under § 2254(e)(1)'s deferential standards.

34

The new evidence presented by Mr. Nicholls does not affirmatively demonstrate his innocence. *See Phillips v. Ferguson*, 182 F.3d 769, 774 (10th Cir. 1999) ("To prevail, [Applicant] must identify evidence that affirmatively demonstrates his innocence.") (citations omitted). Rather, the new evidence provides additional information regarding the credibility and/or reliability of the prosecution's fire expert and his methodologies, and demonstrates that an ASTM standard, which was a proposed standard at the time of trial, was formally adopted.

Initially, the Court will consider the "new evidence" regarding new scientific advancements, including a new ASTM standard regarding xylenes. Although the Court finds the evidence regarding accelerants and xylenes to be highly technical (and not overwhelmingly persuasive) regarding whether fires were intentionally set, the new ASTM standard regarding xylenes is not "new evidence." The new standard was a "proposed new standard" at the time of Mr. Nicholls' trial and Mr. Nicholls' defense attorney rigorously questioned witnesses regarding the proposed new standard. (*See* ECF No. 13-4 at 13; Tr. Trans. 4188-89 & 4226-27). Therefore, the new standard does not demonstrate that Mr. Nicholls is actually innocent. Further, Applicant has failed to demonstrate that any other "scientific advancements" establish his actual innocence. As a result, considering the trial evidence and the evidence of the new ASTM standard and other scientific advancements together, Mr. Nicholls has not demonstrated that it is more likely than not that no reasonable juror would have convicted him. Therefore, Mr. Nicholls' allegations of "new evidence" regarding the new ASTM standard and other scientific advancements does not establish that he is entitled to review of his procedurally defaulted Claim One.

Next, the Court considers the "new evidence" that the prosecution's lead fire expert, Mr. DeHaan, changed his opinion in a separate Louisiana case because of advancements in fire science. Such evidence does not affirmatively demonstrate that Mr. DeHaan's opinion in the Nicholls case was incorrect. To the contrary, Mr. DeHaan testified at the postconviction hearing that his opinion in the Louisiana case changed because the trial court instructed him that he was not allowed to use grand jury testimony regarding location of interior furniture. (ECF 13-4 at 11 & ECF No. 13-6 at 9). According to Mr. DeHaan, because the Louisiana residence was completely destroyed and he could not consider statements regarding the furniture in the residence, he did not have sufficient data to complete any calculations. (*Id.*). Mr. DeHaan specifically stated at the 35(c) hearing that nothing in the Louisiana case or in the recent scientific literature would cause him to change his opinion in the Nicholls case. (*Id.*). As such, this case remains a "classic battle of two highly qualified experts," just as it was at trial. The new evidence regarding Mr. DeHaan's change of opinion in the Louisiana case could be used at a new trial to further try to impeach Mr. DeHaan's credibility. However, it would just be one more additional attempt to discredit his testimony and bolster the defense expert's testimony, Mr. Lentini. Mr. DeHaan was extensively cross examined at trial by Mr. Nicholls' defense counsel regarding his methodologies, including the use of "hand modeling." (ECF No. 13-6 at 10; Tr. Trans. 4169-4188).

In his Traverse, Mr. Nicholls notes that twenty months after his Rule 35(c) evidentiary hearing, Mr. DeHaan "was forced to testify before the American Academy of Forensic Science ethics committee concerning his unreliable scientific methods – those same ones he wrongly used in my case. At the hearing, De[H]aan agreed that he had

36

not adhered to reliable scientific methods and had been unethical." (ECF No. 40 at 14).

Mr. Nicholls attached a (supposedly confidential) report from the Ethics Committee of

the American Academy of Forensic Science (ECF No. 40 at 26-51), which provided the

following summary of its investigation into Mr. DeHaan:

> The Ethics Committee found that the respondent acted
> unethically regarding his misleading testimony in the
> Gutweiler case [the Louisiana case] and his failure to later
> correct his testimony, his subservience to the wishes of the
> prosecutors regarding the contents of his reports, and his
> conclusions in one of his reports that were not based on
> sound science.  His misleading testimony and faulty reports
> in part lead [sic] to a prolonged investigation, charges of
> capital murder, and the incarceration of Gutweiler.  The
> Committee recommends that the respondent be expelled
> from the Academy.

(*Id.* at 26).  This is troubling information about the prosecution's lead fire expert.

Although this report from the Ethics Committee could substantially undermine the

credibility of Mr. DeHaan's testimony regarding his opinion in this case, the evidence of

the report again goes to the impeachment of Mr. DeHaan's testimony, it does not

demonstrate Mr. Nicholls' actual innocence.  Evidence which merely corroborates,

impeaches, or raises "some suspicion or doubt" about guilt is insufficient to satisfy the

"actual innocence" standard. *Stafford,* 34 F.3d at 1561.  Mr. Nicholls has presented no

new evidence attesting to his actual innocence. *See Schlup,* 513 U.S. at 316 ("Without

any new evidence of innocence, even the existence of a concededly meritorious

constitutional violation is not in itself sufficient to establish a miscarriage of justice that

would allow a habeas court to reach the merits of a barred claim.").  As the trial court

discussed (and is supported by the Supplemental State Court Record), there was

additional evidence of Mr. Nicholls' guilt presented at trial, including: testimony by Mr.

Nicholls' cellmate, Hiram Church, that Mr. Nicholls had confessed to the crime; evidence that Mr. Nicholls and his wife were in significant debt, had serious drug problems, and were engaged in failing businesses; evidence that the Nicholls often had large fires in the front of their house; evidence that Mr. Nicholls' wife, Deborah, had unusual behavior after arriving at the fire scene, including that she did not seem concerned for her children's well-being and did not attend their funeral; Mr. Nicholls' changing statements regarding the fire that did not fit with the physical evidence; and forensic evidence presented by the insurance company's investigator and two fire investigators for the City of Colorado Springs that they could not find an innocent explanation for the fire and they determined early on in the investigation that the likely cause was arson. (ECF No. 13-6 at 3-4). Therefore, even if a jury completely discredited Mr. DeHaan's testimony, Applicant has failed to meet his burden and present new evidence so persuasive that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538. Thus, Mr. Nicholls has not demonstrated a fundamental miscarriage of justice sufficient to overcome his procedural default. As a result, his procedurally defaulted Claim One will be dismissed.

## V. ORDERS

Based on the above findings, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, ECF No. 1, is DISMISSED WITH PREJUDICE. It is

FURTHER ORDERED that there is no basis on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c). It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order is not taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of appeal.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.  It is

FURTHER ORDERED that Applicant's "Request for Court Ordered Evidentiary Hearing" (ECF No. 36) is DENIED.  It is

FURTHER ORDERED that Applicant's Motion to Appoint Pro Bono Counsel (ECF No. 41) is DENIED.

DATED at Denver, Colorado, March 23, 2020.

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge